WO     IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

JOHN PETERSON,                          )
                                        )
              Plaintiff,                )
                                        )
    vs.                                 )
                                        )
COMMISSIONER OF SOCIAL SECURITY         )
ADMINISTRATION,                         )
                                        )   No. 1:18-cv-0014-HRH
              Defendant.                )
_____)

O R D E R

This is an action for judicial review of the denial of disability benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401-434, 42 U.S.C. §§ 1381-1383f. Plaintiff John Peterson has timely filed his opening brief,[1] to which defendant, the Commissioner of the Social Security Administration,[2] has timely responded. Oral argument was not requested and is not deemed necessary.

Procedural Background

In March 2015, plaintiff filed applications for disability benefits under Title II and Title XVI of the Social Security Act, alleging that he became disabled on January 6, 2015.

---

[1]Docket No. 12.

[2]Docket No. 13.

-1-

Plaintiff alleged that he was disabled because of GERD, anxiety, dysthymia, high cholesterol, tachycardia, insomnia, agoraphobia, panic disorder, angina, and low back pain. Plaintiff's applications were denied initially. Plaintiff requested a hearing. After an administrative hearing on August 28, 2017, an administrative law judge (ALJ) denied plaintiff's applications. Plaintiff sought review of the ALJ's unfavorable decision. On September 24, 2018, the Appeals Counsel denied plaintiff's request for review, thereby making the ALJ's December 5, 2017 decision the final decision of defendant. On November 5, 2018, plaintiff commenced this action in which he asks the court to review defendant's final decision.

General Background

Plaintiff was born on August 19, 1954. He was 60 years old on his alleged onset date and 63 years old at the time of the administrative hearing. Plaintiff has a GED. Plaintiff's past work includes work as a hospital cleaner, a steward on the Alaska Ferry System, a driver, and a cashier.

The ALJ's Decision

The ALJ first found that plaintiff met "the insured status requirements of the Social Security Act through December 31, 2019."[3]

The ALJ then applied the five-step sequential analysis used to determine whether an individual is disabled.[4]

---

[3]Admin. Rec. at 18.

[4]The five steps are as follows:

(continued...)

At step one, the ALJ found that plaintiff had "not engaged in substantial gainful activity since January 6, 2015, the alleged onset date. . . ."[5]

At step two, the ALJ found that plaintiff had "the following severe impairments: panic with situational agoraphobia, intermittent lumbar radiculopathy with no neurological findings, status post Barrett's esophageal stricture-hiatal hernia disorder, and obesity. . . ."[6] The ALJ found plaintiff's "history of supraventricular tachycardia" and hyperlipidemia non-

---

[4](...continued)
>Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
>Step two: Is the claimant's alleged impairment sufficiently severe to limit ... h[is] ability to work? If so, proceed to step three. If not, the claimant is not disabled.
>Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.
>Step four: Does the claimant possess the residual functional capacity ("RFC") to perform ... h[is] past relevant work? If so, the claimant is not disabled. If not, proceed to step five.
>Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow ... h[im] to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

[5]Admin. Rec. at 18.

[6]Admin. Rec. at 18.

severe.[7] And, the ALJ found plaintiff's alleged dysthymia and insomnia were not "medically determinable impairments."[8]

At step three, the ALJ found that plaintiff did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. . . ."[9] The ALJ considered Listing 1.04A (disorders of the spine) and Listing 12.06 (anxiety and obsessive compulsive disorders). The ALJ noted that

> [a]lthough there are no specific medical listings regarding the claimant's Barrett's esophageal stricture-hiatal hernia and obesity symptoms, the undersign has nonetheless considered their effects on each body system included in the listings, and finds that the evidence does not show that the claimant's Barrett's esophageal stricture-hiatal hernia and obesity symptoms are of listing level severity.[10]

The ALJ considered the "paragraph B" criteria and found that plaintiff had no limitations as to understanding, remembering, or applying information; moderate limitations in interacting with others; no limitations with regard to concentration, persistence, or pace; and no

---

[7]Admin. Rec. at 19.

[8]Admin. Rec. at 19.

[9]Admin. Rec. at 19.

[10]Admin. Rec. at 19.

limitations as to adapting or managing oneself.[11] The ALJ also found that the "paragraph C" criteria were not met.[12]

"Between steps three and four, the ALJ must, as an intermediate step, assess the claimant's RFC." Bray v. Comm'r of Social Security Admin., 554 F.3d 1219, 1222–23 (9th Cir. 2009). The ALJ found that plaintiff had "the residual capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except he can frequently climb ramps or stairs, balance, kneel, crouch, and crawl. He can occasionally stoop and climb ladders, ropes, or scaffolds. The claimant can have frequent but not constant interaction with the general public."[13]

The ALJ gave significant weight to the opinion of Dr. Valette[14] because she "had the opportunity to review [the] complete medical record[.]"[15] The ALJ gave little weight to the opinion of ANP Workman[16] because "the degree of impairment Ms. Workman opines . . . is

---

[11]Admin. Rec. at 20.

[12]Admin. Rec. at 20.

[13]Admin. Rec. at 21.

[14]Dr. Valette testified as a medical expert at the administrative hearing. She testified that plaintiff would have moderate limitations in terms of his ability to work around the general public. Admin. Rec. at 49.

[15]Admin. Rec. at 23-24.

[16]ANP Workman provided mental health treatment for plaintiff. On October 31, 2016, she opined that plaintiff's "severe anxiety . . . limits his ability to function and maintain employment. Mr. Peterson is one of the few patients I can say with certainty [that] he is
(continued...)

too extreme to be persuasive and is not supported by her treatment notes" and because "the determination of disability is one reserved for the Commissioner."[17] The ALJ gave little weight to Mr. Merrifield's opinion[18] "because [his] report is incomplete and the missed days of work estimate is excessive and unsupported by the record[.]"[19] The ALJ gave little weight

---

[16](...continued) disabled as a result of his mental health problems." Admin. Rec. at 1397. She also opined that plaintiff had limited but satisfactory abilities to ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors; was seriously limited but not precluded in his ability to remember work-like procedures, understand/remember/carry out simple instructions, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, be aware of normal hazards and take appropriate precautions, set realistic goals or make plans independently of others, and maintain socially appropriate behavior; and was unable to meet competitive standards as to his ability to maintain attention for a 2-hour period, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being unduly distracted, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods; respond appropriately to changes in the workplace, deal with normal work stress, understand/remember/carry out detailed instructions, deal with the stress of semiskilled and skilled work, interact appropriately with the public, adhere to basic standards of neatness and cleanliness, travel in unfamiliar places, and use public transportation. Admin. Rec. at 1399-1400. ANP Workman also opined that plaintiff would miss more than four days of work per month. Admin. Rec. at 1401.

[17] Admin. Rec. at 24.

[18] Merrifield was plaintiff's mental health counselor. On November 15, 2016, Merrifield opined that plaintiff would miss more than four days of work per month because "[h]e would be unable to get to work or stay at work due to complex trauma symptoms and panic attacks coupled w/ a dread of going outside." Admin. Rec. at 1406.

[19] Admin. Rec. at 24.

to Dr. Kesselring's opinion[20] because "it is vague and does not describe the specific functional limitations the claimant would have as a result of his panic/anxiety symptoms."[21] The ALJ gave significant weight to Dr. Kidder's opinion[22] because he "is a specialist and is familiar with Agency listings and regulations" and "had the opportunity to review the entire

---

[20] John Kesselring, Ph.D., examined plaintiff on November 12, 2015. Dr. Kesselring's assessment was that plaintiff "should continue with his treatment at SEARHC behavioral health. Anxiety is likely to continue to adversely affect his ability to function in the community, including in work situations." Admin. Rec. at 820.

[21] Admin. Rec. at 24.

[22] Dr. Kidder testified as a vocational expert at the administrative hearing. Dr. Kidder testified that

> [a]s far as exertional limitations, I believe that [plaintiff] could occasionally lift 50 pounds, frequently lift 25 pounds. He could stand or walk for six hours in an eight-hour workday; could sit for six hours in an eight-hour workday. I believe the pushing and pulling would be unlimited, except for the weight limits I mentioned previously. As far as postural limitations, I believe he could frequently climb ramps or stairs. He could occasionally do ladders, ropes or scaffolds. He could frequently do balancing and occasionally do stooping; frequently do kneeling, crouching and crawling. As far as manipulative limitations, I believe there is no limitation as far as reaching, handling, fingering, or feeling. I saw no evidence of any visual limitation and I also saw no evidence of any limitation as far as hearing or speaking. As far as environmental limitations, I do not believe that there are any limits as far as cold, heat, wetness, humidity, noise, vibration, fumes or odors and I didn't feel there were any limits as far as hazards such as machinery or heights.

Admin. Rec. at 41-42.

evidentiary record[.]"[23] The ALJ gave significant weight to Dr. Bronstein's opinion[24] because "it is consistent with other opinions in the record as well as the medical evidence as a whole."[25] The ALJ gave significant weight to the Dr. Hunter's opinion[26] that plaintiff "was able to lift, carry, and handle objects of light weight regularly and moderate weight on occasion" but no weight to his opinion that plaintiff's "ability to make occupational, social and personal adjustments was impaired by his anxiety and agoraphobia."[27] The ALJ only gave partial weight to Dr. Anderson's opinion[28] because it was internally inconsistent as Dr. Anderson "noted that all of claimant's conditions were chronic and unlikely to improve, but

---

[23] Admin. Rec. at 24.

[24] On June 6, 2017, H. Bronstein, M.D., opined that plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand/walk for 6 hours, sit for 6 hours, was unlimited as to pushing/pulling, could frequently climb ramps/stairs, balance, kneel, crouch, and crawl; could never climb ladder/ropes/scaffolds; could occasionally kneel; and should avoid all exposure to hazards. Admin. Rec. at 845-848.

[25] Admin. Rec. at 25.

[26] Robert C. Hunter, M.D., examined plaintiff on November 16, 2015. Admin. Rec. at 826.

[27] Admin. Rec. at 25.

[28] Dr. Anderson was plaintiff's PCP. On June 23, 2015, Dr. Anderson opined that plaintiff could stand/walk for 3-5 hours, could sit for 6-8 hours, could lift 10 pounds continuously, could lift 20 pounds frequently, could lift 50 pounds occasionally, could use his feet to operate foot controls repetitively, could bend occasionally, could climb occasionally, could grasp, could do fine manipulation, and that severe social phobia/agoraphobia limits the time he can be in public places/around people. Admin. Rec. at 520.

then indicated that the claimant's symptoms might improve with ongoing treatment."[29] The ALJ considered the lay testimony of plaintiff's sister[30] and gave it little weight because "the limitations she opines are not consistent with the medical evidence."[31]

The ALJ found plaintiff's pain and symptom statements less than credible because plaintiff's mental impairments were responding to treatment, he did not follow through with treatment recommendations, his daily activities were inconsistent with disability, he obtained unemployment benefits, and he had a sporadic work history prior to his alleged onset date.[32]

At step four, the ALJ found that plaintiff "is capable of performing past relevant work as a hospital cleaner."[33]

Thus, the ALJ found that plaintiff "has not been under a disability, as defined in the Social Security Act, from January 6, 2015, through the date of this decision. . . ."[34]

---

[29] Admin. Rec. at 25.

[30] Plaintiff's sister, Debra Graceland, completed a third-party function report on July 6, 2015. Admin. Rec. at 292-300.

[31] Admin. Rec. at 25.

[32] Admin. Rec. at 22-23. Although plaintiff does not challenge the ALJ's credibility findings, the ALJ was simply wrong about plaintiff's sporadic work history. There is a large gap in his social security earnings because he worked for the State of Alaska, which does not participate in the Social Security retirement benefit system.

[33] Admin. Rec. at 25.

[34] Admin. Rec. at 26.

Standard of Review

Pursuant to 42 U.S.C. § 405(g), the court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner. . . ." The court "properly affirms the Commissioner's decision denying benefits if it is supported by substantial evidence and based on the application of correct legal standards." Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997). "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Id. (quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)). "'To determine whether substantial evidence supports the ALJ's decision, [the court] review[s] the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion.'" Id. (quoting Andrews, 53 F.3d at 1039). If the evidence is susceptible to more than one reasonable interpretation, the court must uphold the Commissioner's decision. Id. But, the Commissioner's decision cannot be affirmed "'simply by isolating a specific quantum of supporting evidence.'" Holohan v. Massanari, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999)).

Discussion

Plaintiff argues that the ALJ erred because the ALJ failed to consider Dr. Wilson's treatment notes and her determination that plaintiff needed surgery to repair the Nissen

fundoplication.[35]  Dr. Wilson treated plaintiff in 2016 and 2017 for his gastric impairment.

On January 7, 2016, Dr. Wilson noted that

> [y]ears ago, [plaintiff] had a Nissen fundoplication that was done in Southeast and he fairly quickly developed a slippage of the fundoplication and had to go back on PPI.  Unbeknownst to me, I see that Dr. William Bowers performed an upper endoscopy on Mr. Peterson just about 6 months ago and found a slipped Nissen fundoplication and large hiatal hernia with a short area of Barrett's esophagus.  Biopsies are showing intestinal metaplasia but no dysplasia, and his plan was for followup EGD in 5 years.  I discussed this with Mr. Peterson, but he is quite adamant that we proceed tomorrow [with the] EGD which was already scheduled and in place.  He has been having quite a bit of reflux symptoms, which happened kind of out of the blue, even with very minimal provocation.  He describes 1 event of gross regurgitation of some tea that he drank that just came right out after having settled down for the night to sleep, but it refluxed out and he vomited back in to a bucket.  This seems to be happening more frequently and John is quite concerned about it.  He denies any dysplasia.  Food is traveling down quite well.  Unfortunately, he has been eating a little too much and has gained quite a bit of weight since I had last seen him.  Weight today is 102.9, up from 94.7 kg 6 months ago.[36]

Dr. Wilson

> explained to [plaintiff] that it probably is not necessary to repeat this EGD, but he was quite adamant so we will proceed. . . .

---

[35]"'Surgery for GERD may involve a procedure to reinforce the lower esophageal sphincter called Nissen fundoplication.  In this procedure, the surgeon wraps the top of the stomach around the lower esophagus.  This reinforces the lower esophageal sphincter, making it less likely that acid will back up in the esophagus.'"  Plaintiff's Opening Brief at 9, Docket No. 12 (quoting https://mayoclinic.org/diseases-conditions/gerd/multimedia/gerd-surgery/img-20006950).

[36]Admin. Rec. at 971.

> Regarding the plan for the slipped Nissen fundoplication, he may need to have a redo Nissen, but I would like to see him lose about 20 to 30 pounds because operating on him at this state is probably contraindicated.[37]

On January 8, 2016, plaintiff had an upper endoscopy.[38] Dr. Wilson's assessment was:

> Slipped Nissen fundoplication, short segment Barrett's, and sliding hiatal hernia. No evidence of recurrent squamous papilloma. John has active bile reflux. This may respond favorably to Liquid Carafate, which I will prescribe for him. He may need a redo Nissen; however with his 30-pound weight gain, I think it is not a good idea to plan on surgery at this time. If he can lose 20-30 pounds, he may be a candidate for redo Nissen, which I think should probably be done in Seattle. . . .[39]

On January 17, 2017, Dr. Wilson noted that plaintiff

> has been doing well. The liquid Carafate helps to control his symptoms pretty well, though he still has quite a bit of nocturnal reflux and regurgitation. He has not had any success in losing weight. He was about 30 pounds overweight last time and he still may be 30 or 40 pounds overweight now. He has not been doing exercise, but is enthusiastic about taking it up again. He definitely feels a little bad about that. He does note that his stomach is hard and he has some gas now that is hard to get rid of.[40]

Plaintiff's physical exam was unremarkable and Dr. Wilson's plan was to

---

[37]Admin. Rec. at 972.

[38]Admin. Rec. at 1009.

[39]Admin. Rec. at 1010.

[40]Admin. Rec. at 961.

repeat EGD since his symptoms seem to have progressed. I will re-biopsy the Barrett's. If there is no progression, we can drop back down to surveillance EGD according to Dr. B[owers'] schedule of EGD in 5 years. Regarding the history of colon polyps, we can probably follow Dr. Rosenzweig's plan of FIT test at 5 years from his last scope which would be 3 years from now.[41]

On February 7, 2017, plaintiff had an upper endoscopy.[42] Dr. Wilson's assessment was "Barrett's esophagus with slipped Nissen fundoplication, development of mild stricture and evidence of delayed gastric emptying."[43] Dr. Wilson noted that

> [i]t seems John has had increasing symptoms and [it] may be time to seriously consider redoing his Nissen fundoplication; however, his anatomy is complex and unfavorable by the appearance of it today. We will set up a plan for him to come back in about 4 months. I put him on strict exercise and weight loss diet and will have him come back to see Dr. Nathaniel Eastman for assessment and consideration of potential redo Nissen fundoplication. This may be amenable to robotic surgery, if available, in the relative near future.[44]

In his decision, the ALJ stated that "[w]hile the claimant had reported ongoing symptoms related to" his Barrett's esophageal stricture and hiatal hernia, "the record indicates that the claimant has not followed through with treatment recommendations."[45] The

---

[41]Admin. Rec. at 961-962.

[42]Admin. Rec. at 879.

[43]Admin. Rec. at 880.

[44]Admin. Rec. at 880.

[45]Admin. Rec. at 22.

ALJ then explained that "[a]t one visit, it was noted that the claimant had not taken the sucralfate or zofran that was prescribed, had not elevated the head of his bed, and had not added ranitidine 300 as instructed by Dr. Wilson, a surgeon, at the last scoping. . . ."[46] The ALJ found that plaintiff's "lack of follow through with treatment recommendations that could improve his symptoms strongly suggest[s] that his symptom[s] are not as limiting as he had alleged."[47] This was the only express mention the ALJ made of Dr. Wilson.

"Because [an ALJ] must give 'specific and legitimate reasons' for rejecting a treating doctor's opinions, it follows even more strongly that an ALJ cannot in [his] decision totally ignore a treating doctor and his or her notes, without even mentioning them." Marsh v. Colvin, 792 F.3d 1170, 1172–73 (9th Cir. 2015) (quoting Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014). In Marsh, "[t]he record on which the ALJ denied Marsh's application contain[ed], among other evidence, medical opinions from several doctors, including clinical progress (SOAP) notes from Dr. David H. Betat[.]" Id. at 1171.

> Dr. Betat's SOAP notes track[ed] Marsh's clinical progress, beginning in September 2003 and ending in November 2006. Dr. Betat's SOAP note from January 31, 2006 states, in part:
>
>> The patient has chronic trochanteric bursitis to the point that she is pretty much nonfunctional. She also finds herself not being able to concentrate enough to do office work such as bookkeeping. The patient appears to be disabled, unfortunately,

---

[46]Admin. Rec. at 22.

[47]Admin. Rec. at 22.

> at a fairly young age. It seems to be legitimate,
> although it is sometimes difficult to tell for sure.

Id. "The ALJ's decision denying Marsh disability benefits nowhere mention[ed] Dr. Betat or his SOAP notes." Id. The Ninth Circuit held that this was error because the ALJ "gave no reasons for not mentioning Dr. Betat or his SOAP notes." Id. at 1172.

Similarly here, the ALJ did not give any reasons for barely mentioning Dr. Wilson, and then only in the context of finding plaintiff's symptom statements less than credible. As defendant points out, "the ALJ is 'not required to discuss every piece of evidence.'" Hiler v. Astrue, 687 F.3d 1208, 1212 (9th Cir. 2012) (quoting Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003)). But, "[i]n determining a claimant's RFC, an ALJ must consider all relevant evidence in the record, including, inter alia, medical records[.]" Robbins v. Social Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006). While the ALJ did cite[48] to Dr. Wilson's February 7, 2017 note regarding plaintiff's 2017 EGD, this citation is not enough to make it clear to the court that the ALJ considered Dr. Wilson's treatment notes.

Dr. Wilson's treatment notes indicate that plaintiff's gastric condition was getting progressively worse and was at the point that surgical intervention might be necessary. The ALJ's decision is silent as to this aspect of Dr. Wilson's treatment notes, which were relevant evidence. The Ninth Circuit has held that an "ALJ cannot in [his] decision totally ignore a treating doctor and his or her notes[.]" Marsh, 792 F.3d at 1172–73 (9th Cir. 2015). Yet that

---

[48]Admin. Rec. at 22.

is what the ALJ did here. The ALJ largely ignored Dr. Wilson's treatment notes. Thus, the ALJ erred as to Dr. Wilson.

The next question is whether this error was harmless. "Harmless error . . . exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." Garcia v. Comm'r of Social Sec., 768 F.3d 925, 932 (9th Cir. 2014) (citation omitted). Plaintiff primarily argues that the ALJ's error as Dr. Wilson was not harmless because if this evidence had been considered, it is likely the ALJ would have found he had additional limitations flowing from his gastric impairment. Plaintiff argues that the surgery proposed by Dr. Wilson was the prescription for relief for his gastric impairment that causes vomiting, which is vocationally significant because it impacts time on task as well as positional tolerances.

Defendant aptly points out that there is no evidence in the record that plaintiff would have any impairments associated with chronic nausea. It is for perhaps this reason that plaintiff argues that the ALJ failed to fully and fairly develop the record. "The ALJ in a social security case has an independent 'duty to fully and fairly develop the record and to assure that the claimant's interests are considered.'" Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001) (quoting Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996)). But, an "ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." McLeod v. Astrue, 640 F.3d 881, 885 (9th Cir. 2011) (citation omitted).

Defendant argues that the record in this case was not inadequate, in large part because Dr. Kidder considered the longitudinal record and thus would have considered whether plaintiff had any limitations flowing from his gastric impairment. Dr. Kidder testified that he had reviewed all the medical evidence of record,[49] which does suggest that Dr. Kidder considered Dr. Wilson's treatment notes and her statements about possible surgery. But, as plaintiff points out, Dr. Kidder never mentioned Dr. Wilson's treatment notes other than to cite to the 2017 EGD[50] and the ALJ did not expressly ask Dr. Kidder about the impact that plaintiff's chronic nausea might have on his ability to sustain full-time employment. In addition, there were ambiguities in Dr. Wilson's treatment notes that the ALJ should have attempted to resolve. For instance, in her January 2017 treatment note, Dr. Wilson noted that plaintiff was doing well but in her February 2017 treatment note, she indicated that it might be time to seriously consider surgery.

The court concludes that the ALJ's error as to Dr. Wilson's treatment notes was not harmless. Had the ALJ properly considered Dr. Wilson's treatment notes, which it is not clear that the ALJ did, it is possible that the ALJ would have found additional limitations related to plaintiff's gastric impairment, which appeared to be causing chronic nausea.[51] This matter must be remanded for further administrative proceedings so that the ALJ can consider

---

[49]Admin. Rec. at 38.

[50]Admin. Rec. at 39.

[51]See Admin. Rec. at 659, 665, 986, 1192, 1228, 1281.

-17-

Dr. Wilson's treatment notes and determine whether plaintiff had any additional limitations related to his gastric impairment that would impact his ability to sustain full-time work.

## Conclusion

Defendant's final decision is reversed, and this matter is remanded for further proceedings.

DATED at Anchorage, Alaska, this 24th day of April, 2019.

/s/ H. Russel Holland
United States District Judge